## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| GITA GARFINKEL, on behalf of herself and all others similarly situated,<br><br>　　　　　　　Plaintiff,<br><br>　　vs.<br><br>ENZO BIOCHEM, INC., ENZO CLINICAL LABS, INC., and LAB CORPORATION OF AMERICAN HOLDINGS.<br><br>　　　　　　　Defendants. | Case No. _____<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Gita Garfinkel ("Plaintiff"), formerly known as Gita Freundlich, individually and on behalf of all others similarly situated (collectively, "Class Members"), by and through her undersigned attorneys, brings this Class Action Complaint against Defendants Enzo Biochem, Inc., Enzo Clinical Labs, Inc., and Lab Corporation of American Holdings ("Enzo Biochem," "Enzo Clinical," and "Labcorp" or, collectively, "Defendants"), and complains and alleges upon personal knowledge as to herself and information and belief as to all other matters.

## INTRODUCTION

1.　　Plaintiff brings this class action against Enzo Biochem, Enzo Clinical, and Labcorp for their failure to secure and safeguard the personally identifiable information ("PII") and personal health information ("PHI") (collectively, "Private Information") of approximately 2,470,000 individuals, including Plaintiff.

2.　　On or about April 6, 2023, Defendants "identified a ransomware incident on [their] computer network." A subsequent investigation determined that there was a cybersecurity incident between April 4, 2023, and April 6, 2023, during which unauthorized third parties accessed Plaintiff's and Class Members' Private Information stored on Defendants' network (the "Data

Breach").[1]

3.      The data reportedly exposed in the breach includes the most sensitive types of data that cybercriminals seek in order to commit fraud and identity theft.  According to Defendants, information disclosed in the breach includes names, Social Security numbers, dates of birth, driver's license numbers, financial account information, health insurance, policy numbers, Medical Record Numbers, Medicaid or Medicare IDs, and health information such as treatment and diagnosis information.

4.      Defendants owed a duty to Plaintiff and Class Members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII/PHI against unauthorized access and disclosure.  Defendants breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect their consumers' PII/PHI from unauthorized access and disclosure.

5.      As a result of Defendants' inadequate security and breach of their duties and obligations, the Data Breach occurred, and Plaintiff's and Class Members' PII/PHI was accessed and disclosed.  This action seeks to remedy these failings and their consequences.  Plaintiff brings this action on behalf of herself and all persons whose PII/PHI was exposed because of the Data Breach, which Defendants learned of on or about April 11, 2023, and first publicly acknowledged on May 30, 2023.

6.      Plaintiff, on behalf of herself and all other Class Members, asserts claims for negligence, negligence per se, breach of fiduciary duty, breach of implied contract, unjust enrichment, and violation of New York General Business Law § 349, and seeks declaratory relief,

---

[1] Notice of Data Security Incident, https://www.enzoclinicallabs.com/Uploaded/Website-Notice.pdf (last visited June 12, 2023).

injunctive relief, monetary damages, statutory damages, punitive damage, equitable relief, and all other relief authorized by law.

## PARTIES

7.     Plaintiff Gita Garfinkel is a New Jersey resident.  Plaintiff Garfinkel received a letter from Defendant Enzo Clinical notifying her that her PII/PHI was among the information accessed by cybercriminals in the Data Breach.  Had Plaintiff Garfinkel known that Defendants would not adequately protect her and Class Members' PII/PHI, she would not have received services from Defendants or any of their affiliates and would not have provided her PII/PHI to Defendants or any of their affiliates.

8.     Defendant Enzo Biochem is a New York Corporation, with its principal place of business at 81 Executive Blvd. Suite 3, Farmingdale, NY, United States, 11735.

9.     Defendant Enzo Clinical is a New York Corporation, with its principal place of business at 28 Liberty Street, New York, NY, United States, 10005.

10.     Defendant Labcorp is a North Carolina Corporation, with its principal place of business at 531 South Spring Street, Burlington, NC, United States, 27215.

## FACTUAL ALLEGATIONS

### *Overview of Enzo Biotech, Enzo Clinical Labs, and Labcorp*

11.     Enzo Biotech is a molecular diagnostics company that develops "unique diagnostic platform technologies that provide numerous advantages over previous standards."[2]  Enzo Biotech describes itself as an "integrated diagnostics, clinical lab, and life sciences company." Enzo Biotech develops, manufactures, and sells proprietary diagnostic testing technology and products to clinical laboratories, specialty clinics, and researchers nationwide.

---

[2] Home, Enzo Biotech, https://www.enzo.com/ (last visited June 14, 2023).

12.     For example, Enzo Biotech's service "GoTestMeNow," allows prospective patients to request and pay for routine lab tests online.  An independent physician will then review the test requests without the need for an in-person doctor's visit.  If the physician decides to order a requested test, the patient can provide the necessary sample to Enzo Biotech by visiting one of its "Patient Service Centers." The lab results are then sent directly to the customer's "secure" GoTestMeNow account.[3]

13.     The company's strategy is "focused on offering quality and affordable testing solutions to high volume market segments where reimbursement pressures have caused challenges for our customers within these segments."[4]

14.     According to Defendants' website, the business activities of Defendant Enzo Biochem "are performed" by the company's three wholly owned subsidiaries, which includes Defendant Enzo Clinical.  Enzo Clinical is a clinical reference laboratory providing a wide range of clinical services to physicians, medical centers, other clinical labs, and pharmaceutical companies.[5] According to its most recent Form 10-K filed with the Securities and Exchange Commission for the fiscal year ended July 31, 2022, approximately 70% of Enzo Biochem's revenue for the previous year or $74.4 million, came from the Enzo Clinical operating segment.

15.     On information and belief, Defendant Labcorp purchased Defendant Enzo Clinical on March 17, 2023.  It has been reported that Labcorp agreed to pay $146 million to acquire Enzo's clinical laboratory division.[6]

16.     As a condition of providing services, Defendants require that its customers entrust

---

[3] GoTestMeNow, https://www.enzoclinicallabs.com/ (last visited June 15, 2023).
[4] *Id.*
[5] Enzo Clinical Labs, https://www.enzoclinicallabs.com/ (last visited June 15, 2023).
[6] Med City News, https://medcitynews.com/2023/03/labcorp-shells-out-146m-to-buy-enzo-biochems-clinical-labbusiness/ (last visited June 15, 2023).

it with Private Information.  In doing so, Defendants implicitly promise to safeguard their Private Information.

17.    Defendant Enzo Biochem's Privacy Policy states it "respects individual privacy and values the confidence of its customers, partners, investors, and employees." Further, they assure consumers that their Private Information "will not be transferred outside the company without your prior const" and "will make [] every reasonable effort to protect the information collected."[7]

18.    Despite recognizing their duty to do so on information and belief, Defendants have not implemented reasonable safeguards or policies to protect consumers' Private Information.

19.    As a HIPAA-covered business entity (*see infra*), Defendants are required to implement adequate safeguards to prevent unauthorized use or disclosure of Personal Information, including by implementing requirements of the HIPAA Security Rule and to report any unauthorized use or disclosure of Personal Information, including incidents that constitute breaches of unsecured protected health information as in the case of the Data Breach complained of herein.

20.    Defendants did not maintain adequate security to protect its systems from infiltration by cybercriminals, and it waited nearly two months to disclose the Data Breach publicly.

### *The Data Breach*

21.    On information and belief, on April 6, 2023, Defendants discovered that unauthorized users had gained access to their network systems.  Defendants' investigation revealed that an unauthorized party had access to Defendants' network from April 4, 2023 to April 6, 2023.

---

[7] Privacy Policy, Enzo Biotech, https://enzo.com/footer-links/privacy-policy (last visited June 14, 2023).

22.    Defendants' investigation revealed that their cybersecurity and data security systems were completely inadequate and allowed cybercriminals to obtain files containing thousands of their consumers' Private Information.

23.    In a report filed with the Securities and Exchange Commission, Defendants describe the following:

> On April 11, 2023, the Company became aware that certain data, including names, test information, and Social Security numbers, was accessed, and in some instances, exfiltrated from the Company's information technology systems as part of this incident. The investigation of this incident and the assessment of its impact is ongoing. However, the Company identified unauthorized access to or acquisition of clinical test information of approximately 2,470,000 individuals. The Social Security numbers of approximately 600,000 of these individuals may also have been involved.[8]

24.    On or around May 31, 2023, almost two months after the Data Breach occurred, Defendants finally began notifying Plaintiff and Class Members about the Data Breach.

### *Defendants' Notice Was Deficient*

25.    Defendants' notices concerning the Data Breach were deficient both in their content and their unexplained tardiness.

26.    Defendants' notices, which were substantively identical, do not provide critical information: how long the unauthorized attackers were inside of Defendants' systems, how unauthorized attackers were able to get inside Defendants' systems without detection, and how unauthorized attackers were able to exfiltrate Personal Information without detection.

27.    According to the notice issued by Defendant Enzo Clinical, its "computer network"

---

[8] SEC Form 8-K Enzo Biochem, Inc.,
https://www.sec.gov/Archives/edgar/data/316253/000121390023044007/ea178836-
8k_enzobiohem.htm (last visited June 15, 2023).

was subject to "a ransomware incident" between April 4, 2023 and April 6, 2023.[9]

28.     Defendants' subsequent internal investigation determined that "an unauthorized party accessed files" on Enzo Clinical Labs' computer systems during this time period.[10]

29.     Defendants' notice does not state who this "unauthorized party" was or whether a ransomware demand was made to or paid by Defendants.

30.     The files that were accessed by the unauthorized party included patient names, dates of service, clinical test information, and Social Security numbers.

31.     While Defendants claim to be offering credit monitoring and identity theft protection services, it appears to be only doing so with respect "to those whose Social Security numbers were involved."[11]

32.     Defendants also claim in the breach notice to have undertaken steps to "enhance the security of our computer systems and the data we maintain."[12]

33.     The targeted attack was expressly designed to gain access to and exfiltrate private and confidential data, including (among other things) the Private Information of patients, like Plaintiff and Class Members.

34.     Despite learning that the Data Breach compromised PII and PHI on April 6, 2023, Defendants waited over two months following the completion of its investigation to notify the impacted individuals of the Data Breach and the need for them to protect themselves against fraud and identity theft.  Defendants were too late in the discovery and notification of the Data Breach.

35.     Due to Defendants' inadequate security measures and its delayed notice to victims,

---

[9] Notice of Data Security Incident, https://www.enzoclinicallabs.com/Uploaded/Website-Notice.pdf (last visited June 12, 2023).
[10] *Id*.
[11] *Id*.
[12] *Id.*

Plaintiff and Class Members now face a present, immediate, and ongoing risk of fraud and identity theft that they will have to deal with for the rest of their lives.

### *Defendants Failed To Safeguard Personal Information*

36.    Defendants failed to exercise reasonable care in protecting patients' information.

37.    Defendants have a non-delegable duty under federal law to ensure that all information they collect, and store is secure and that any associated entities with whom they shared information maintain adequate and commercially reasonable data security practices to ensure the protection of patients' Personal Information.

38.    Indeed, Defendants' entire business depends on patients entrusting them with their Personal Information.  Without patients' Personal Information, Defendants would not be able to perform any services and certainly would not be able to bill patients and their insurance companies and collect payment for services rendered.

39.    Defendants are entities covered by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), *see* 45 C.F.R. § 160.102, and as such, are required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

40.    These rules establish national standards for the protection of patient information, including "protected health information," defined as "individually identifiable health information" which either "identifies the individual" or where there is a "reasonable basis to believe the information can be used to identify the individual," that is held or transmitted by a healthcare provider.  *See* 45 C.F.R. § 160.103.

41.    HIPAA limits the permissible uses of "protected health information," prohibits unauthorized disclosures of "protected health information," and requires that Defendants implement appropriate safeguards for this information.

42.    Under HIPAA, covered entities such as Defendants may only disclose PHI to a "business associate" if the covered entity obtains satisfactory assurances that the business associate, here Defendants, will use the information only for the purposes for which it was engaged by the covered entity, will safeguard the information from misuse, and assist in compliance with HIPAA privacy obligations.[13]

43.    HIPAA further mandates that Defendants disclose no more PHI to a business associate than what is minimally necessary to accomplish the purposes for which it was engaged by the covered entity. *See* 45 C.F.R § 164.502(b).

44.    HIPAA requires that Defendants provide notice of a breach of unsecured protected health information, which includes protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons (i.e., unencrypted data).

45.    Defendant Enzo Biochem's Code of Business Conduct and Ethics states, "The Company is fully committed to the intent and implementation of the Health Insurance Portability and Accountability Act of 1996 (HIPAA) or equivalent foreign directive. Each employee, director, and officer has an obligation to protect from unauthorized or inappropriate disclosure of confidential member information, including medical records and member/enrollee demographic information."[14]

46.    Defendants' vague notices indicate that it failed to detect unauthorized attackers

---

[13] *See* 45 CFR §§ 164.502(e), 164.504(e), 164.532(d) and (e).
[14] Enzo Biotech, https://enzo.com/pages/code-of-business-conduct-and-ethics (last visited June 15, 2023).

and had information exfiltrated without detection.

47. The unstated length of time between the Data Breach and Defendants' claimed discovery of the Data Breach indicates that Defendants' systems to detect intrusion, detect unusual activity, and log and report such events were inadequate and not in compliance with industry standards. For example, according to technology security company FireEye, the median amount of time between when a data breach occurs and when it is detected was 78 days in 2018. This number has consistently been trending downward in recent years due to improvements in detection computer technology.[15] Defendants failed to employ reasonable, industry-standard data security practices to safeguard Plaintiff's and Class Members' Personal Information.

### Defendants Violated Regulatory Guidance And HIPAA's Requirements To Safeguard Data

48. Defendants failed to maintain the privacy and security of their patients' PHI and failed to promptly inform patients that their Personal Information was disclosed. Indeed, Defendants violated HIPAA by failing to:

     a.    Maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

     b.    Adequately protect Plaintiff's and Class Members' Personal Information;

     c.    Ensure the confidentiality and integrity of electronically protected health information created, received, maintained, or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

     d.    Implement technical policies and procedures for electronic information systems that maintain electronically protected health information to allow access only to those

---

[15] *M-Trends 2019: FireEye Mandiant Services Special Report*, https://mandiant.widen.net/s/5pwlhgqt5t/m-trends-2020-report (last visited June 15, 2023).

persons or software programs that have been granted access rights, in violation of 45 C.F.R. § 164.312(a)(1);

      e.      Implement adequate policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. § 164.308(a)(1)(i);

      f.      Implement adequate procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports, in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

      g.      Protect against reasonably anticipated uses or disclosures of electronically protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 C.F.R. § 164.306(a)(3);

      h.      Take safeguards to ensure that Defendants' business associates adequately store protected health information;

      i.      Disclose only PHI necessary for Defendants' business associates to accomplish the purposes for which they were engaged, in violation of 45 C.F.R § 164.502(b); and

      j.      Ensure compliance with the electronically protected health information security standard rules by their workforces, in violation of 45 C.F.R. § 164.306(a)(4).

49.      Additionally, federal agencies have issued recommendations and guidelines to help minimize the risks of a data breach for businesses holding sensitive data.  For example, the Federal Trade Commission ("FTC") has issued numerous guides for businesses highlighting the importance of reasonable data security practices, which should be factored into all business-related decision-making.[16]

---

[16] FTC, *Start With Security: A Guide for Businesses*,
https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited June 15, 2023).

50.     The FTC's Protecting Personal Information: A Guide for Business sets forth fundamental data security principles and practices for businesses to implement and follow to protect sensitive data.  Among other things, it notes that businesses should: (a) protect the personal customer information that they collect and store; (b) properly dispose of personal information that is no longer needed; (c) encrypt information stored on their computer networks; (d) understand their network's vulnerabilities; and (e) implement policies to correct security problems.  The FTC guidelines further recommend that businesses use an intrusion detection system, monitor all incoming traffic for unusual activity, monitor for large volumes of data being transmitted from their system, and have a response plan ready in the event of a breach.[17]

51.     Additionally, the FTC recommends that organizations limit access to sensitive data, require the use of complex passwords on networks, employ industry-tested methods for security, monitor suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.[18]

52.     The FTC has brought enforcement actions against businesses for failing to reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.  Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.[19]

53.     Defendants were fully aware of their obligations to implement and use reasonable measures to protect the Personal Information of Plaintiff and Class Members but failed to comply

---

[17] *Id.*

[18] *Id.*

[19] FTC, *Privacy and Security Enforcement*, https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy/privacy-security-enforcement (last visited June 15, 2023).

with these basic recommendations and guidelines that would have prevented the Data Breach from occurring.

*Plaintiff's and Class Members' Personal Information Is Highly Valuable*

54.    Defendants were or should have been aware that they were collecting highly valuable data, which has increasingly been the target of data breaches in recent years.[20]

55.    The U.S. Department of Health and Human Services, Office for Civil Rights, lists the Data Breach as one of the largest healthcare breaches reported in 2022.[21]

56.    As early as 2014, the FBI alerted the healthcare industry that it was increasingly a preferred target of hackers, stating "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining Protected Health Information (PHI) and/or Personally Identifiable Information (PII)" so that these companies could take the necessary precautions to thwart such attacks.[22]

57.    Further, Cathy Allen, CEO of Shared Assessments, a cyber-risk management group, stated that "just the types of test proscribed might indicate a type of illness that you would not want employers or insurance companies to have. Thieves often steal and resell insurance data on the internet . . . having other information makes the data more valuable and the price higher."[23]

58.    Personal Information is a valuable commodity to identity thieves.  Compromised Personal Information is traded on the "cyber black-market." As a result of recent large-scale data

---

[20] Healthcare Data Breach Statistics, HIPAA Journal, https://www.hipaajournal.com/healthcare-data-breach-statistics/ (last visited June 15, 2023) ("Our healthcare data breach statistics clearly show there has been an upward trend in data breaches over the past 10 years.").

[21] U.S. Dep't of Health and Human Services, Office for Civil Rights, *Cases Currently Under Investigation*, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last visited June 15, 2023).

[22] Jim Finkle, *FBI warns healthcare firms they are targeted by hackers*, REUTERS, Aug. 20, 2014, http://www.reuters.com/article/us-cybersecurity-healthcare-fbi-idUSKBN0GK24U20140820 (last visited June 15, 2023).

[23] *Id.*

breaches, identity thieves and cybercriminals have openly posted stolen credit card numbers, Social Security numbers, and other Personal Information on the dark web, making the information publicly available.[24]

59.    Healthcare data is especially valuable on the black market.  According to one report, a healthcare data record may be valued at up to $250 per record, compared to $5.40 for the next highest value record (a payment card).[25]

60.    According to a *Reuters* investigation that included interviews with nearly a dozen healthcare executives, cybersecurity investigators, and fraud experts, medical data for sale on the black market "includes names, birth dates, policy numbers, diagnosis codes and billing information."[26] Fraudsters commonly use that data "to create fake IDs to buy medical equipment or drugs that can be resold, or they combine a patient number with a false provider number and file made-up claims with insurers."[27]

61.    According to Tom Kellermann, chief cybersecurity officer of cybersecurity firm Carbon Black, "[h]ealth information is a treasure trove for criminals [because] by compromising it, by stealing it, by having it sold, you have seven to 10 personal identifying characteristics of an

---

[24] *Here's How Much Your Personal Information Is Selling for on the Dark Web,* https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited June 15, 2023); McFarland et al., *The Hidden Data Economy*, at 3, https://www.mcafee.com/enterprise/en-us/assets/reports/rp-hidden-data-economy.pdf (last visited June 15, 2023).
[25] *Hackers, Breaches, and the Value of Healthcare Data* (June 20, 2021), https://www.securelink.com/blog/healthcare-data-new-prize-hackers/ (last visited June 15, 2023).
[26] Jim Finkle, *Your medical record is worth more to hackers your credit card*, Reuters, https://www.reuters.com/article/us-cybersecurity-hospitals/your-medical-record-is-worth-more-to-hackers-than-your-credit-card-idUSKCN0HJ21I20140924 (last visited June 15, 2023).
[27] *Id.*

individual."[28] For this reason, a patient's full medical records can sell for up to $1,000 on the dark web, while credit card numbers and Social Security numbers may cost $5 or less.[29]

62.      As noted by Paul Nadrag, a software developer for medical device integration and data technology company Capsule Technologies:

> The reason for this price discrepancy—like any other good or service—is perceived value. While a credit card number is easily canceled, medical records contain a treasure trove of unalterable data points, such as a patient's medical and behavioral health history and demographics, as well as their health insurance and contact information. Once records are stolen, cybercriminals often tap into members of a criminal network on the dark web experienced in drug trafficking and money laundering who are eager to buy medical records to support their criminal activities, such as illegally obtaining prescription medications, filing bogus medical claims or simply stealing the patient's identity to open credit cards and fraudulent loans.[30]

### Defendants Harmed Plaintiff and Class Members By Allowing Anyone To Access Their Personal Information

63.      Defendants knew or should have known both that medical information is incredibly valuable to hackers and that healthcare data breaches are on the rise.  Accordingly, Defendants were on notice for the harm that could ensue if they failed to protect patients' data.

64.      Given the sensitive nature of the Personal Information stolen in the Data Breach—including Social Security numbers, dates of birth, driver's license numbers, financial account information, health insurance policy numbers, Medical Record Numbers, Medicaid or Medicare IDs, and health information, such as treatment and diagnosis info—hackers have the ability to

---

[28] Andrew Steger, *What Happens to Stolen Healthcare Data?* (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (last visited June 15, 2023).

[29] Paul Nadrag, *Here's How Much Your Personal Information Is Selling for on the Dark Web* (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited June 15, 2023).

[30] *Industry Voices—Forget credit card numbers. Medical records are the hottest items on the dark web* (Jan. 26, 2021), https://www.fiercehealthcare.com/hospitals/industry-voices-forget-credit-card-numbers-medical-records-are-hottest-items-dark-web (last visited June 13, 2023).

commit identity theft, financial fraud, and other identity-related fraud against Plaintiff and Class Members now and in the indefinite future.

65.     Identity thieves can use the stolen information to: (a) create fake credit cards that are used to make purchases as if they were the real credit cards; (b) reproduce stolen debit cards and use them to withdraw cash from ATMs; (c) commit immigration fraud; (d) obtain a fraudulent driver's license or ID card in the victim's name; (e) obtain fraudulent government benefits; (f) file a fraudulent tax return using the victim's information; (g) commit medical and healthcare-related fraud; (h) access financial accounts and records; or (i) commit any number of other frauds, such as obtaining a job, procuring housing, or giving false information to police during an arrest. Further, loss of private and personal health information can expose the victim to loss of reputation, loss of employment, blackmail, extortion, and other negative effects.

66.     While federal law generally limits an individual's liability for fraudulent credit card charges to $50, there are no such protections for a stolen medical identity.  According to a 2015 survey on medical identity theft conducted by the Ponemon Institute, victims of medical identity theft spent an average of $13,500 in out-of-pocket costs to resolve the crime.[31] Frequently, this information was used to obtain medical services or treatments (59%), obtain prescription drugs (56%), or receive Medicare and Medicaid benefits (52%).

67.     According to the Ponemon study, "[t]hose who have resolved the crime spent, on average, more than 200 hours on such activities as working with their insurer or healthcare provider to make sure their personal medical credentials are secured and can no longer be used by an imposter and verifying their personal health information, medical invoices and claims and

---

[31] *Ponemon Institute*, *Fifth Annual Study on Medical Identity Theft*, https://static.nationwide.com/static/2014_Medical_ID_Theft_Study.pdf?r=65 (last visited June 15, 2023).

electronic health records are accurate."[32]

68.    Additionally, the study found that medical identity theft can have a negative impact on reputation, as 45% of respondents said that medical identity theft affected their reputation mainly because of embarrassment due to disclosure of sensitive personal health conditions, with 19% responding that they missed out on employment opportunities as a result.[33]Exacerbating the problem, victims of medical identity theft oftentimes struggle to resolve the issue because HIPAA regulations require the victim to be personally involved in the resolution of the crime.[34] In some cases, victims may not even be able to access medical records using their personal information because they include a false name or data points taken from another person's records. Consequently, only 10% of medical identity theft victims responded that they "achiev[ed] a completely satisfactory conclusion of the incident."[35]

69.    Moreover, it can take months or years for victims to even discover they are the victim of medical-related identity theft or fraud given the difficulties associated with accessing medical records and healthcare statements.  For example, the FTC notes that victims may only discover their identity has been compromised after they:

- Receive a bill for medical services they did not receive;

- Get contacted by a debt collector about medical debt they do not owe;

- See medical collection notices on their credit report that they do not recognize;

- Find erroneous listings of office visits or treatments on their explanation of benefits;

- Receive information from their health plan that they have reached their limit on benefits; or

---

[32] *Id*. at 2.
[33] *Id*. at 14.
[34] *Id*. at 1.
[35] *Id*.

- Are denied insurance because their medical records show a condition they do not have.[36]

70.    Other types of medical fraud include "leveraging details specific to a disease or terminal illness, and long-term identity theft."[37] According to Tom Kellermann, "[t]raditional criminals understand the power of coercion and extortion.  By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[38] Long-term identity theft occurs when fraudsters combine a victim's data points, including publicly-available information or data points exposed in other data breaches, to create new identities, open false lines of credit, or commit tax fraud that can take years to remedy.

71.    As explained further by the FTC, medical identity theft can have other serious consequences:

> Medical ID thieves may use your identity to get treatment – even surgery – or to bilk insurers by making fake claims. Repairing damage to your good name and credit record can be difficult enough, but medical ID theft can have other serious consequences. If a scammer gets treatment in your name, that person's health problems could become a part of your medical record. It could affect your ability to get medical care and insurance benefits, and could even affect decisions made by doctors treating you later on. The scammer's unpaid medical debts also could end up on your credit report.[39]

72.    As the result of the wide variety of injuries that can be traced to the Data Breach, Plaintiff and Class Members have and will continue to suffer economic loss and other actual harm

---

[36] *FTC, Medical Identity Theft FAQs for Health Care Providers and Health Plans*, https://www.ftc.gov/system/files/documents/plain-language/bus75-medical-identity-theft-faq-health-care-health-plan.pdf (last visited June 15, 2023).
[37] Steger, *What Happens to Stolen Healthcare Data?* (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (last visited June 15, 2023).
[38] *Id.*
[39] *Medical ID Theft: Health Information for Older People*, FTC, https://web.archive.org/web/20201019075254/https://www.consumer.ftc.gov/articles/0326-medical-id-theft-health-information-older-people (last visited June 15, 2023).

for which they are entitled to damages, including, but not limited to, the following:

      a.     losing the inherent value of their Personal Information;

      b.     identity theft and fraud resulting from the theft of their Personal Information;

      c.     costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

      d.     costs associated with purchasing credit monitoring, credit freezes, and identity theft protection services;

      e.     unauthorized charges and loss of use of and access to their financial account funds and costs associated with the inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit;

      f.     lowered credit scores resulting from credit inquiries following fraudulent activities;

      g.     costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including discovering fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposing withdrawal and purchase limits on compromised accounts; and

      h.     the continued imminent and certainly impending injury flowing from potential fraud and identify theft posed by their Personal Information being in the possession of one or many unauthorized third parties.

73.     Plaintiff and Class Members place significant value in data security. According to

a recent survey conducted by cyber-security company FireEye, approximately 50% of consumers consider data security to be a main or important consideration when making purchasing decisions and nearly the same percentage would be willing to pay more in order to work with a provider that has better data security. Likewise, 70% of consumers would provide less personal information to organizations that suffered a data breach.[40]

74.    Because of the value consumers place on data privacy and security, companies with robust data security practices can command higher prices than those who do not. Indeed, if consumers did not value their data security and privacy, Defendants would have no reason to tout their data security efforts to their actual and potential customers.

75.    Consequently, had Plaintiffs and Class Members known the truth about Defendants' data security practices—that they did not adequately protect and store their Personal Information—they would not have entrusted their Personal Information to Defendants.

### *Damages Sustained by Plaintiff and the Other Class Members*

76.    Plaintiff and all other Class Members have suffered injury and damages, including, but not limited to: (i) a substantially increased risk of identity theft and medical identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII/PHI; (iii) breach of the confidentiality of their PII/PHI; (iv) deprivation of the value of their PII/PHI, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft and medical identity theft they face and will continue to face; and (vi) overpayment for the services that were received without

---

[40] FireEye, *Beyond the Bottom Line: The Real Cost of Data Breaches* (May 2016), https://www2.fireeye.com/rs/848-DID-242/images/rpt-beyond-bottomline.pdf (last visited June 15, 2023).

adequate data security.

## **CLASS ALLEGATIONS**

77.    This action is brought and may be properly maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

78.    Plaintiff brings this action on behalf of himself and all members of the following Class of similarly situated persons:

> All persons whose PII/PHI was accessed in the Data Breach by unauthorized persons, including all persons who were sent a notice of the Data Breach.

79.    Excluded from the Class are Defendants and their affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge(s).

80.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

81.    The members in the Class are so numerous that a joinder of all Class Members in a single proceeding would be impracticable.  Defendants, through their affiliates, reported to the Securities and Exchange Commission that the breach affected approximately 2,470,000 persons.[41]

82.    Common questions of law and fact exist as to all Class Members and predominate over any potential questions affecting only individual Class Members.  Such common questions of law or fact include, *inter alia*:

> A.    Whether Defendants had a duty to implement and maintain reasonable

---

[41] SEC, Form 8-K Enzo Biochem, Inc., https://www.sec.gov/Archives/edgar/data/316253/000121390023044007/ea178836-8k_enzobiohem.htm (last accessed June 15, 2023).

security procedures and practices to protect and secure Plaintiff's and Class Members' PII/PHI from unauthorized access and disclosure;

        B.      Whether Defendants failed to exercise reasonable care to secure and safeguard Plaintiff's and Class Members' PII/PHI;

        C.      Whether an implied contract existed between Class Members and Defendants providing that Defendants would implement and maintain reasonable security measures to protect and secure Class Members' PII/PHI from unauthorized access and disclosure;

        D.      Whether Defendants breached their duties to protect Plaintiff's and Class Members' PII/PHI; and

        E.      Whether Plaintiff and all other members of the Class are entitled to damages and the measure of such damages and relief.

83. Defendants engaged in a common course of conduct, giving rise to the legal rights sought to be enforced by Plaintiff on behalf of himself and all other Class Members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

84. Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the Class, had her PII/PHI compromised in the Data Breach. Plaintiff and Class Members were injured by the same wrongful acts, practices, and omissions committed by Defendants as described herein. Plaintiff's claims, therefore, arise from the same practices or course of conduct that give rise to the claims of all Class Members.

85. Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff is an adequate representative of the Class in that Plaintiff has no interests adverse to, or that conflict with, the Class Plaintiff seeks to represent. Plaintiff has retained counsel with

substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

86.     A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages and other financial detriment suffered by Plaintiff and all other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class Members to individually seek redress from Defendants' wrongful conduct.  Even if Class Maembers could afford individual litigation, the court system could not.  Individualizedlitigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, the economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

87.     Plaintiff realleges and reincorporates by reference all preceding paragraphs as if fully set forth herein.

88.     Defendants owed a duty to Plaintiff and all other Class Members to exercise reasonable care in safeguarding and protecting their PII/PHI in their possession, custody, or control.

89.     Defendants knew the risks of collecting and storing Plaintiff's and all other Class Members' PII/PHI and the importance of maintaining secure systems.  Defendants knew of the many data breaches that targeted companies that store PII/PHI in recent years.

90.     Given the nature of Defendants' business, the sensitivity and value of the PII/PHI it maintains, and the resources at their disposal, Defendants should have identified the vulnerabilities to their systems and prevented the Data Breach from occurring.

91.     Defendants breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII/PHI entrusted to it—including Plaintiff's and Class Members' PII/PHI.

92.     It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class Members' PII/PHI to unauthorized individuals.

93.     But for Defendants' negligent conduct or breach of the above-described duties owed to Plaintiff and Class Members, their PII/PHI would not have been compromised.

94.     As a result of Defendants' above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and all other Class Members have suffered and will continue to suffer economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and medical identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII/PHI; (iii) breach of the confidentiality of their PII/PHI; (iv) deprivation of the value of their PII/PHI, for which there is a

well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vi) overpayment for the services that were received without adequate data security.

## COUNT II
## NEGLIGENCE PER SE

95.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

96.     Defendants' duties arise from, inter alia, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

97.     Defendants' duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by a business, such as Defendants, of failing to employ reasonable measures to protect and secure PII/PHI.

98.     Defendants violated HIPAA Privacy and Security Rules and Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiff's and all other Class Members' PII/PHI and not complying with applicable industry standards.  Defendants' conduct was particularly unreasonable given the nature and amount of PII/PHI it obtains and stores and the foreseeable consequences of a data breach involving PII/PHI, including, specifically, the substantial damages that would result to Plaintiff and the other Class Members.

99. Defendants' violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA constitute negligence per se.

100. Plaintiff and Class Members are within the class of persons that HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to protect.

101. The harm occurring as a result of the Data Breach is the type of harm HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to guard against.

102. It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and Class Members' PII/PHI to unauthorized individuals.

103. The injury and harm that Plaintiff and the other Class Members suffered was the direct and proximate result of Defendants' violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA. Plaintiff and Class Members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, inter alia: (i) a substantially increased risk of identity theft and medical identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII/PHI; (iii) breach of the confidentiality of their PII/PHI; (iv) deprivation of the value of their PII/PHI, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vi) overpayment for the services that were received without adequate data security.

## COUNT III
## BREACH OF FIDUCIARY DUTY

104.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

105.    Because of Defendants' relationship with Plaintiff and Class Members, Defendants became guardians of Plaintiff's and Class Members' Private Information.  Defendants' acceptance and storage of Plaintiff's and Class Members' PII/PHI created a fiduciary relationship between Defendants and Plaintiff and Class Members.  In light of this relationship, Defendants must act primarily for Plaintiff and Class Members, which includes safeguarding and protecting Plaintiff's and Class Members' PII/PHI.

106.    Defendants had a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of their relationship.  It breached that duty by failing to properly protect the integrity of the system containing Plaintiff's and Class Members' PII/PHI, failing to comply with the data security guidelines set forth by HIPAA, and otherwise failing to safeguard Plaintiff's and Class Members' PII/PHI that it collected.

107.    As a direct and proximate result of Defendants' breaches of their fiduciary duties, Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were

received without adequate data security.

**COUNT III**
**BREACH OF IMPLIED CONTRACT**

108.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

109.    In connection with receiving medical services, Plaintiff and all other Class Members entered into implied contracts with Defendants.

110.    Pursuant to these implied contracts, Plaintiff and Class members paid money to Defendants, whether directly or through their insurers or medical providers, and provided Defendants with their PII/PHI.  In exchange, Defendants agreed to, among other things, and Plaintiff understood that Defendants would: (1) provide medical services to Plaintiff and Class Members; (2) take reasonable measures to protect the security and confidentiality of Plaintiff's and Class Members' PII/PHI; and (3) protect Plaintiff's and Class Members PII/PHI in compliance with federal and state laws and regulations and industry standards.

111.    The protection of PII/PHI was a material term of the implied contracts between Plaintiff and Class Members.  Indeed, as set forth supra, Class Members recognized their duty to provide adequate data security and ensure the privacy of their consumers' PII/PHI with their practice of providing consumers with a privacy policy.  Had Plaintiff and Class Members known that Defendants would not adequately protect their PII/PHI, they would not have received services from Defendants' affiliates.

112.    Plaintiff and Class Members performed their obligations under the implied contract when they provided Defendants with their PII/PHI and paid—directly or through their insurers—for health care or other services from Defendants.

113.    Defendants breached their obligations under their implied contracts with Plaintiff

and Class Members in failing to implement and maintain reasonable security measures to protect and secure their PII/PHI and in failing to implement and maintain security protocols and procedures to protect Plaintiff's and Class Members' PII/PHI in a manner that complies with applicable laws, regulations, and industry standards.

114.    Defendants' breach of implied contracts with Plaintiff and Class Members directly resulted in the Data Breach and the injuries that Plaintiff and all other Class Members have suffered from the Data Breach.

115.    Plaintiff and all other Class Members were damaged by Defendants breach of implied contracts because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of the value of their PII/PHI, for which there is a well-established national and international market; (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vii) overpayment for the services that were received without adequate data security.

**COUNT V**
**UNJUST ENRICHMENT**

116.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

117.    This claim is pleaded in the alternative to the breach of implied contract claim. Plaintiff and Class Members conferred a monetary benefit upon Defendants in the form of monies paid for health care or other services.

118.    Defendants accepted or had knowledge of the benefits conferred upon it by Plaintiff and Class Members.  Defendants also benefitted from the receipt of Plaintiff's and Class Members' PII/PHI, as this was used to facilitate payment.

119.    As a result of Defendants' conduct, Plaintiff and Class Members suffered actual damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures that Plaintiff and Class Members paid for and those payments without reasonable data privacy and security practices and procedures that they received.

120.    Defendants should not be permitted to retain the money belonging to Plaintiff and Class members because Defendants failed to adequately implement the data privacy and security procedures for themselves that Plaintiff and Class Members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

121.    Defendants should be compelled to provide for the benefit of Plaintiff and Class members all unlawful proceeds received by it as a result of the conduct and Data Breach alleged herein.

**PRAYER FOR RELIEF**

Plaintiff, individually and on behalf of all members of the Class, respectfully requests that the Court enter judgment in her favor and against Defendants as follows:

A.    Certifying the Class as requested herein, designating Plaintiff as Class representative, and appointing Plaintiff's counsel as Class Counsel;

B.    Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C.    Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as

may be appropriate. Plaintiff, on behalf of themselves and the Class, seek appropriate injunctive relief designed to prevent Defendants from experiencing another data breach by adopting and implementing best data security practices to safeguard PII/PHI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D.      Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E.      Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F.      Awarding Plaintiff and the Class such other favorable relief as allowable under law.

### JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.


Dated: June 15, 2023                          Respectfully Submitted,

                                              /s/ Todd S. Garber
                                              Todd S. Garber
                                              **FINKELSTEIN, BLANKINSHIP,**
                                              **FREI-PEARSON & GARBER, LLP**
                                              One North Broadway, Suite 900
                                              White Plains, NY 10601
                                              Tel: 914-298-3284
                                              Fax: 914-908-6722
                                              tgarber@fbfglaw.com

                                              /s/ Paul M. Sod
                                              Paul M. Sod
                                              **The Law Office of Paul M. Sod**
                                              337R Central Avenue
                                              Lawrence, New York 11559
                                              Tel: (516) 295-0707
                                              Fax: (516) 295-0722
                                              paulmsod@gmail.com